Good morning. May it please the Court and Council, Mr. Wagner. My name is Bernard Phelan. I am pleased to represent Michelle Alcorn in this matter. Everyone in this room guards their good name and reputation. And we also believe that we will not lose our livelihood without good cause. And those are the reasons that the United States Supreme Court has said that a person has a liberty interest in her good name and reputation and has a property interest in her reasonable expectation of continued employment that cannot be taken without due process. When Michelle Alcorn was suddenly fired as a certified police officer for supposed criminal conduct without a hearing, without a chance, back, too loud? Yeah, I mean, you're one of the few, but you're doing it right. You're doing it right. You're one of the few that does it right. Go ahead. All right, thank you. Without a chance to tell her side of the story and contrary to the written promises of a progressive discipline made by the town to its employees, and then her termination for alleged criminal conduct was reported to the Wyoming Peace Officers Standards and Training Commission, relying upon those Supreme Court cases, Board of Regents v. Roth, Perry v. Sinderman, Paul v. Davis, Bishop v. Wood, and others, she sued for unlawful deprivation of her constitutionally protected liberty and property interest and the common law counts of defamation and breach of contract. In this case, there are really two issues. Was the defamation that was given to the Peace Officers Standards and Training Commission published in accordance with precedent in this court, the Workman case? And second, does the employee's handbook provide evidence of reasonable expectation of continued employment, which would amount to a property interest? I'll bite on the property interest question. What do we do about the pages with the bold where your client acknowledged that she'd received the handbook and on the pages where the bold print was and acknowledged that she'd read it? Wyoming law has said, Wyoming Supreme Court cases have said that a disclaimer in an employee's handbook which otherwise provides progressive discipline and promises of fairness is just one factor to be considered by a jury in determining whether or not there was a contract that could be terminated only for cause. Isn't the conspicuous nature of the disclaimer an important factor though? It is a factor that can be considered by a jury, but it could also consider other things like the other provisions of the employee's handbook which promises progressive discipline and fairness and other things. Does it promise progressive discipline or is it more aspirational? Does it reserve the right for immediate termination in certain instances? It does, but that again is just one factor to be considered by the jury, not as a matter of law can this contract which consists of other promises, other representations, other aspirational things that a person might read and say, well, they're going to be fair with me. Plus, there's other evidence of the intent of the parties and that's the course of dealing of the parties. When the town of La Barge terminated Michelle Alcorn, they had a reason and they put it in writing and they said that they made an investigation and then they terminated her employment. That is a course of dealing where it shows, evidence shows that the town believed that they had to have a reason. Now, doesn't that show fairness and good faith on their part though? Well, it sure tells you that way it wouldn't be a breach. If that's something that can be argued to a jury, what is the intent of the parties when they say we can fire you at will or for a reason or no reason at all and they come up with a reason? That's a course of dealing that can be considered. And other evidence can be considered like the bad blood between the mayor and the former police chief. That can be considered in terms of whether or not there was cause, legitimate cause for termination. So going back to the idea that they put it in writing, did an investigation and everything, is it your argument that that's evidence of the city's construction of the employment agreement? That they had to do that? Yes. It's a course of dealing between the parties. If in fact the city believed that its contract provided for at will termination would make it very easy. You are terminated. That's it. At will. But instead, they go ahead and come up with this reason. Now the reason we believe is false and can be proven to be false. But they demonstrated through their actions that they believed that they had to have a reason. Now these employee handbooks I've litigated for 30 years, these employee handbooks, they are a subterfuge. They are a way of encouraging people that they as employees will be treated fairly. Let me ask you this. What did your client do when she received the written notice that she was being terminated after this investigation? She complained. She went to city council members. She said this is not true. She was asked would she appear before the city council and explain her side of the story. She said yes. So if I look at the record will I see that she said I was entitled to a hearing or I was entitled to progressive discipline? Am I going to see those things in the record? Yes, you can. You can see where she says it's just common sense that you have to have a reason for terminating. That's different than my question. I want to know if she said at any time if we're going to find in the record that she demanded that she receive a hearing. Okay. Demand to receive a hearing. Now we're getting very technical and she's just an employee, one, the single deputy police officer in this case. And she says it's not fair. The council member says would you appear before the county or before the council? And she said yes, I would. She went to the council meeting. They met in private and came out and said what's done is done. So no opportunity to... That was an invitation to a city council meeting. She didn't try to assert any right to a hearing herself. And look, I'm not being critical of her actions. I'm just trying to find out what happened. No, she didn't say I demand a hearing, no. Did she tell people I should have received some kind of lesser punishment than I received? No, she didn't have a chance. She was done. Everything was taken away from her. Her car, her badge, her implements. Literally the day that she was given this letter. And so she was trying to assert her rights, tell her side of the story to the entity, to the town of LaBarge. But that was denied. And she then found out that she had been reported to terminated for criminal activity. And the situation there is that the statute provides, and it's cited in the brief, that all information provided to peace officers, standard and training will be made available to potential employers of people seeking to be able to receive information from that database. And that's the only way that we're managing publication of this material. Is it your understanding that private citizens can go get information from that database? Or is it only stated? The statute says that it will be made of any practice that allows the public to access those records? I think only through a public records demand, through the Public Records Act, and that sort of thing might be available, depending upon the exemptions that are provided in those other statutes. But being available to the public and being available to your potential employers is an entirely different thing. Your potential employers are the people who will provide you with a livelihood, which is the meaning of a liberty interest. The Supreme Court, in paraphrasing, has said that when a person's good name and reputation are besmirched, then your freedom, your liberty to pursue your chosen occupation has been taken. And you can't be done without due process of law. Your Honor, I will, or may it please the Court, I will reserve the balance of my time. May it please the Court. Good morning. My name is Dan White. I am currently serving in the Office of the Attorney General of Wyoming, and I am appearing here today on behalf of Appellee Jay Harrison. Seated at council tables is Mr. John Bowers, who represents the town of LaBarge. I am going to stop my remarks with three minutes left to give Mr. Bowers an opportunity to argue a few points on behalf of his client. If I may, Your Honor, perhaps it would be helpful to discuss the details of the circumstances of the termination, because I think that there are some details there that would be of assistance to the Court in understanding what occurred here. As you know from the briefs, on April 20th, Ms. Alcorn was placed on administrative suspension by Chief Harrison, and in response to Judge Carson's question, at that time, she basically, there's evidence in the record to say that she wanted the allegations to be investigated, but she did not specifically ask for a hearing. After she was suspended on April 20th, the mayor of the town of LaBarge attempted to contact her between April 20th and April 26th. In his deposition, he stated that he wanted to hear her side of the story. He made phone calls to Ms. Alcorn's residence. He also called one of Alcorn's friends and asked that person to ask Ms. Alcorn to call the mayor, and he did not receive any sort of response to that effort. The mayor also had his own independent concerns regarding the charges that had been asserted against Ms. Alcorn in terms of falsifying timesheets, and that was an incident where the mayor, as a fireman, learned that there was a high-speed chase of some kind that was approaching the town of LaBarge. He heard about this impending event through the fire department communications. He then attempted to contact Ms. Alcorn to determine whether she was on duty and what her response might be. He was unable to reach her. He then contacted dispatch that controls the town of LaBarge, and dispatch advised him that she was not working. So later, he spoke with Ms. Alcorn, and Ms. Alcorn said, oh no, I was on duty working the whole time. So he had a concern because he had received conflicting information from dispatch and from Ms. Alcorn regarding her whereabouts that particular day. The other thing that is significant here is that Ms. Alcorn testified in her deposition that when she was supervised by the prior police chief in LaBarge, she observed that he used dispatch records when he was filling out his timesheets. And she testified that on one occasion, she attempted to use dispatch records to fill out timesheets, but she admitted that her timesheets and her own records did not, or that the two sets of records did not match. So she was aware of the fact that potentially her timesheets did not match dispatch records going back even to her tenure under the previous chief. So do you agree that you needed cause to fire her? Pardon me, your honor. Do you agree that you needed cause to fire her? Oh no, no, no. I don't think that this is, I don't think that this fact is particularly relevant to the ultimate facts of this I was attempting to answer some of your questions in terms of just facts, but no, I do not agree that they needed cause. I think in this case, they had cause to fire her, but they did not need it. What you were talking, it just sounded like you were talking about things that would support cause. So at any rate, I just wanted to make this one final point is just, and again, I think that the equal relationship between Ms. Alcorn and the town of LaBarge was clearly at will. I think that the personnel policies of the town of LaBarge and Ms. Alcorn's signature established that clearly as a matter of law. I think, in fact, I think Wyoming law on this issue was quite clear as you pointed out. What do you say in response to opposing counsel's argument that if she is an effort of providing reasons? Your Honor, first of all, I think that the answer to that is what Judge Carson pointed out. I think that they were trying to be fair. I think they were trying to be reasonable. So that's just gratuitous? Yes, yes, Your Honor. So let me then proceed to the liberty of... Let me ask you a few things. Did she ask for a hearing? She did, Your Honor, in my review of the record indicates that she did not ask for a hearing of any kind. She did, she testified that she did at times ask that the allegations against her be investigated. And between April 20th and April 26th, the police chief, Jay Harrison, did in fact investigate. As I mentioned, the mayor attempted to contact Ms. Alcorn to find out about her side of the story without success. Okay. Did she, did, are you aware of any evidence of the record where she complained that she should have received some type of lesser discipline? No, Your Honor. There is no evidence in the record of that, at least that I saw. Okay. Let me, let me ask you a question about the employment contract. Did, do you agree with counsel that in, in general, that these employment contracts have, or in whether it's a contract, I guess, the employee handbooks sort of have to be taken on, you know, as they're written to determine if there is a contract or not? I do not agree, Your Honor. I think that Wyoming law is clear. The, the Wyoming Supreme Court through a series of cases has made it fairly clear in Wyoming that an employer who wishes to create a personal handbook so that employees know what is expected of them when they're performing their jobs, that employers can, can promulgate or issue an employee handbook and yet still reserve at-will employment status. Okay, so bad, bad question on my part. But depending on what's in the handbook, we have to look at the handbook and what's in it to determine if there was a contract, right? Yes, Your Honor. And let me just ask you a hypothetical. In this case, if there was no conspicuous language and acknowledgement by the plaintiff of the, of the at-will provisions of the employment handbook, would your case be different? Yes, Your Honor. If I understand your question, if there were no disclaimers, if they were not conspicuous, if they were not set forth in bold type, if they were not placed separately on pages in the handbook, and in particular, if the employee had not signed, then potentially we'd be dealing with a situation that would be governed by the older Wyoming Supreme Court cases, specifically, I think it's mobile coal producing versus parks and McDonald versus mobile coal producing, where the Wyoming Supreme Court was struggling with employee handbooks that had, you know, that potentially talked about progressive discipline, but did not make it clear that there was no contract being created. Okay. But subsequent Wyoming Supreme Court cases have cleared that all up, specifically, and in particular of relevance here, a case called Lincoln versus Wackenhut, and the employee handbook in this case, I would submit, is directly related to, was probably written in response to Lincoln versus Wackenhut, and it meets all of the requirements of that case to preserve at-will employment status. If I may, I would like to move on to a liberty interest claim. As you know from the briefs, Chief Harrison, after the termination of Ms. Alcorn, sent a document to Wyoming Post, and it's called a personnel change in status form. All law enforcement agencies in Wyoming, and I think similar statutory schemes exist in other states, are required to report the termination of a peace officer to Post. Subsequently, he sent in another Post document called an informal complaint form, and then subsequently, in response to a request from Post, he sent a memorandum that had additional details regarding the circumstances. So the complaint form, was that required after a termination of a law enforcement officer? That is a good question, Your Honor. I believe that the complaint form was sent in simply because it is, I think it's published on the Post website, and there's no evidence directly in the record as to why Chief Harrison sent the second document, except that I think that it was his understanding that he was required to. At any rate, it is clear, I think, under 10th Circuit precedent that when there's a statutory requirement to report a particular incident to a state agency, such as Post statutes, or child abuse statutes, and things of that nature, that there is a intra-governmental privilege that exists, and that inter-governmental privilege exists regardless of the fact that the town of LaVarge is a municipality in Wyoming, and Post is a state agency in Wyoming. Do you know if the public can get access to the Post reports? Your Honor, I'd like to answer that question in two parts, if I may. First of all, Mr. Phelan is correct that the statute uses the phrase potential employer. However, it is important to remember that there are other statutes in the Post statutes that talk about employer in the sense of a law enforcement agency. If you were going to construe the Post statute as a whole, what you would find is that it was the legislative intent that this information would be available to other law enforcement agencies in Wyoming, and probably to other law enforcement agencies in other states, or to the law enforcement agencies of the federal government. I think it would be a far stretch to conclude that information held by Post is available generally to employers. Post is not an employee information clearinghouse. Do you want to give your friend two minutes? Oh, yes. I'm sorry, Your Honor. So, if I may, I would just conclude that I think that the communications to Post were privileged as intergovernmental communications, and the state law claim for breach of employment contract is barred by the fact that she was at will. And finally, with regard to the defamation claim, that is also governed by common law privileges where the Town of LaBarge and Post had a common interest in the subject of those communications. Thank you. Thank you, Your Honor. My name is John Bowers. I represent the Town of LaBarge. Quickly on the handbook issue, at the Wyoming Precedence Law, the handbook meets the requirements of prominence, placement, and language. It's on page one, page two, and the last page. It's bolded. It's underlined on the first two pages. And the way that this law is developed is that the Wyoming Supreme Court has said that the judge can, the district judge can interpret the handbook as a matter of contract. If it's clear and unambiguous, and it's at will, then the judge can interpret the handbook as a matter of contract. And that is the case. Quickly on the intra-governmental communications, I wanted to say as a former police officer that that is critical to these small towns in Wyoming to have this unbridled communications with Post, because most of the towns in Wyoming are small with little governance over the law enforcement. And so you have lay city councilmen picking a chief of police, and their only real reference is Post. And if you think about the duties of police officers, they see people at their most vulnerable points. And it's critical that this information be allowed to be transmitted to Post and to the cities. I have unfortunately seen situations, although I think law enforcement generally is wonderful, but I've seen some bad situations where people who were in law enforcement should not have been there. And so I think this is a very important point for all of Wyoming, and I'm out of time, and I appreciate you hearing me. Thank you. Thank you. In this case, there was no trial. All of the evidence, the contentions that were made during depositions are grist for the mill in a jury trial. We have had no trial. The contract, the employment of the handbook, and the requirement to sign a disclaimer is an adhesive requirement. To get the job, you must sign this disclaimer. And you're supposed to read and carefully understand the balance of the document. That makes the document itself ambiguous. And somebody who's employed under this employee's handbook would understand that the employee's handbook is meant to impress upon the employee what is going to happen in case of a termination. Progressive discipline. The little, you know, we can change, we can go to the bottom, we don't have to start with first, second, or third. Those are all means to avoid any kind of responsibility to be fair with the employee. And in this case, the employee strongly contends that she was not guilty of any criminal conduct, but that has been reported to the peace officers and standards and training. Well, it says that they're thinking about it. They may. I appreciate that was rather gratuitous, but I think it's an overstatement to that she was under criminal indictment or charged. Well, right. She was never charged. That's other additional evidence as to the validity of this contention that she was involved in criminal activity. She was never charged. And in fact, they didn't follow up on this notice of termination. They let the case or the matter be, quote, dismissed. But that does not erase what happened. All of this information, according to the statute, is to be made available to potential employers. And that's the stigmatization that has occurred that Mrs. Alcorn cannot get rid of. Is there any evidence that the statement about criminality has been published to the public? It has not been published to the public. It has been published to the most important agency for the employment of police officers, which deprives her of her ability to engage in her chosen occupation. That's where it's been published. Very damaging publication. It's a contract of adhesion. Sign and get a job. Don't sign. No job. Is that something that we can countenance in this country? I don't believe so. When you're given promises of fair treatment and employment, your reputation will be maintained. Your job will remain as long as there's no cause. You're out of time. Thank you. Thank you, both. Thank you, all three, for your arguments. Case is submitted. Court is in recess until 3 o'clock this afternoon. Thank you.